## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice<br>Antitrust Division<br>1401 H Street, N.W.<br>Suite 3000<br>Washington, D.C. 20530,<br><br>       Plaintiff,<br><br>       v.<br><br>INCO LIMITED,<br>145 King Street West<br>Suite 1500<br>Toronto, ON, Canada M5H 4B7,<br><br>and<br><br>FALCONBRIDGE LIMITED,<br>207 Queens Quay West<br>Suite 800<br>Toronto, ON, Canada M5J 1A7,<br><br>       Defendants. | CASE NO.:<br><br>DECK TYPE:  Antitrust<br><br>DATE STAMP: |

## COMPLAINT

Plaintiff United States of America ("United States"), acting under the direction of the

Attorney General of the United States, brings this civil antitrust action to obtain equitable relief

against defendants, Inco Limited ("Inco") and Falconbridge Limited ("Falconbridge").  Plaintiff

complains and alleges as follows:

## I.    INTRODUCTION

1.    The United States brings this action for injunctive relief under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Inco and Falconbridge from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  The United States seeks to prevent the proposed acquisition of Falconbridge by Inco because that acquisition would substantially lessen competition in the development, manufacture, and sale of refined nickel of sufficient purity and chemical composition that it can be utilized in super alloys used for safety-critical applications (hereinafter "High-Purity Nickel").  The use of High-Purity Nickel is particularly important in making such products as the rotating parts of jet engines, which are often called "safety-critical parts."

2.    Inco and Falconbridge are two of the world's leading producers of refined nickel, a metallic element that is valued for its resistance to corrosion, stress, and high temperatures. Inco and Falconbridge are also by far the world's two largest producers of High-Purity Nickel.

3.    High-Purity Nickel is primarily distinguished from other refined nickel because it contains lower amounts of certain impurities commonly referred to as trace elements.  In safety-critical parts, for example, the presence of trace elements can make the parts less resistant to the extreme stresses and temperatures under which they operate and may eventually lead to engine failure.

4.    Inco's proposed acquisition of Falconbridge would reduce the number of significant worldwide High-Purity Nickel suppliers from three to two and create a company with over 80 percent of the world's sales of High-Purity Nickel.

5.    Unless the proposed acquisition is enjoined, competition in High-Purity Nickel

2

that has benefitted customers will be substantially reduced. The proposed acquisition would likely result in higher prices, lower quality, less innovation, and less favorable delivery terms in the High-Purity Nickel market.

## II.    THE DEFENDANTS

6.    Defendant Inco is a Canadian corporation with its principal place of business in Toronto, Ontario, Canada. Inco's High-Purity Nickel sales in the United States are made through its wholly-owned subsidiary, International Nickel, Inc. ("INI"). INI is a Delaware corporation with its principal place of business in Saddlebrook, New Jersey.

7.    Inco is one of the largest mining companies in the world. Inco mines, processes, and refines various minerals, including nickel. Inco also produces cobalt and platinum group metals ("PGMs") as by-products of its nickel production. In 2005, Inco reported total sales of approximately $4.7 billion.

8.    Inco's main nickel mining, processing, and refining operations are located in Canada, although it owns mines and processing facilities worldwide. Inco's High-Purity Nickel refining operations are located in Ontario, Canada, and Wales, United Kingdom. Inco's High-Purity Nickel is shipped to customers worldwide, including the United States.

9.    Defendant Falconbridge is a Canadian corporation with its principal place of business in Toronto, Ontario, Canada. Falconbridge's High-Purity Nickel sales in the United States are made through its wholly-owned subsidiary, Falconbridge U.S., Inc. ("FUS"). FUS is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

10.    Like Inco, Falconbridge is one of the world's largest mining companies. Falconbridge mines, processes, and refines various minerals, including nickel and copper.

3

Falconbridge also produces cobalt and PGMs as by-products of both its nickel and copper

production. In 2005, Falconbridge reported total sales of approximately $7.7 billion.

11.    Falconbridge's primary nickel mining and processing facilities are located in

Ontario, Canada, although it also has such facilities worldwide. Falconbridge's only High-Purity

Nickel refining operation is located in Kristiansand, Norway. Falconbridge's High-Purity Nickel

is shipped to customers worldwide, including the United States.

## III.    JURISDICTION AND VENUE

12.    Plaintiff United States brings this action against defendants Inco and Falconbridge

under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain the

violation by defendants of Section 7 of the Clayton Act, 15 U.S.C. § 18.

13.    Defendants produce and sell High-Purity Nickel in the flow of interstate

commerce. Their activities in developing, producing, and selling High-Purity Nickel

substantially affect interstate commerce. This Court has subject matter jurisdiction over this

action pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331,

1337(a), and 1345.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(d). Inco and

Falconbridge have consented to venue and personal jurisdiction in this judicial district.

## IV.    THE PROPOSED TRANSACTION

15.    Pursuant to a Support Agreement dated October 10, 2005, Inco stated that it

intended to offer to purchase all of the common shares of Falconbridge not currently owned by it.

Also pursuant to that Support Agreement, Falconbridge's Board of Directors stated that it had

determined that it is in the best interests of Falconbridge to support the offer, recommend

4

acceptance of Inco's offer to holders of the common shares of Falconbridge, and use its

reasonable best efforts to permit Inco's offer to be successful, on the terms and conditions

contained in the Support Agreement.

16.     On October 24, 2005, Inco made a formal offer to purchase all of the outstanding

common shares of Falconbridge, a transaction now valued at over $15 billion dollars.  Inco's

offer to purchase, originally open for acceptance until December 23, 2005, has been extended

until June 30, 2006.

## V.     REDUCED COMPETITION IN THE HIGH-PURITY NICKEL MARKET

### A.     The Relevant Product Market

17.     Nickel is a metallic element that is particularly resistant to high temperatures, high

stresses, and corrosion.  Nickel is often combined with other materials to form alloys with

particular performance characteristics.  These performance characteristics depend on the amount

of nickel and other elements contained in the particular alloy.

18.     As a general proposition, as the amount of nickel in the alloy increases, the more

resistant the alloy is to heat and stress.  The most common alloy using nickel is stainless steel,

which contains, on average, approximately 10 percent nickel and is used in applications

demanding the least amount of the resistence to heat and stress that nickel provides.

19.     At the other end of the spectrum are so-called super alloys.  Super alloys generally

contain between 50 and 70 percent nickel, as well as specific amounts of other elements,

including iron, cobalt, and chromium, that combine to give the alloy specific performance

characteristics.  Super alloys are primarily used in chemical processing plants, medical

applications, industrial power generation, and various aerospace applications.

20.    Certain products made from super alloys, such as the rotating parts of jet engines, are considered safety-critical parts. For these parts, it is vital that, in addition to containing the proper amount of nickel, the super alloy be as free as possible from certain trace elements that could compromise the performance of the product and result in serious problems, like engine failure. For example, designers of jet engines severely restrict the maximum amounts of trace elements that can be contained in superalloys used to produce moving parts for jet engines.

21.    The nickel that meets demanding safety-critical requirements is High-Purity Nickel. High-Purity Nickel is refined nickel of sufficient purity and chemical composition that it can be utilized in super alloys used for safety-critical applications. Only a small portion of the refined nickel produced in the world has sufficient metal content and purity to qualify as High-Purity Nickel.

22.    Super alloy makers must use High-Purity Nickel to meet the specifications for safety-critical parts. Super alloy makers do not have the in-house capability to remove sufficient quantities of undesirable trace elements from non-High-Purity Nickel to permit them to produce alloys that meet the specifications for safety-critical parts.

23.    A small but significant post-acquisition increase in the price of High-Purity Nickel would not cause the purchasers of safety-critical parts to substitute non-High-Purity Nickel or elements other than nickel so as to make such a price increase unprofitable.

24.    Accordingly, the development, manufacture, and sale of High-Purity Nickel is a line of commerce and a relevant product market for purposes of analyzing this acquisition under Section 7 of the Clayton Act.

6

**B.    The Relevant Geographic Market**

25.    All of the High-Purity Nickel sold in the world is mined, processed, and refined outside of the United States.  Both Inco and Falconbridge sell High-Purity Nickel throughout the world.  Both companies import High-Purity Nickel into the United States and sell that nickel to customers located throughout the United States.

26.    Accordingly, the world is the relevant geographic market within the meaning of Section 7 of the Clayton Act.

**C.    Concentration**

27.    The market for High-Purity Nickel is highly concentrated.  Inco and Falconbridge are by far the two largest producers of High-Purity Nickel sold worldwide and in the United States.

28.    Aside from Inco and Falconbridge, only three companies have demonstrated any ability to produce High-Purity Nickel.  One of these companies consistently produces High-Purity Nickel, but its available capacity is substantially less than that of either Inco or Falconbridge and it cannot economically increase its capacity.  The other two companies are not substantial competitors in the High-Purity Nickel market.  While both have substantial capacity to make non-High-Purity Nickel and both have produced small amounts of High-Purity Nickel, their ability to make High-Purity Nickel, and to make it on a consistent basis, is very limited.

29.    Inco accounts for at least 40 percent of the worldwide sales of High-Purity Nickel.  Similarly, Falconbridge accounts for at least 40 percent of the worldwide sales of High-Purity Nickel.

30.    The market for High-Purity Nickel would become substantially more concentrated

7

if Inco acquires Falconbridge. Combined, Inco and Falconbridge would account for over 80 percent of worldwide High-Purity Nickel sales. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI") (defined and explained in Appendix A), the proposed transaction will increase the HHI in the market for High-Purity Nickel by approximately 3,200 points to a post-acquisition level of approximately 6,800, well in excess of levels that raise significant antitrust concerns.

### D.   Anticompetitive Effects

1.   **The Proposed Transaction Will Harm Competition in the Market for High-Purity Nickel.**

31.   High-Purity Nickel customers generally view Inco's and Falconbridge's High-Purity Nickel as their only available options and do not view the products of other producers as viable alternatives for High-Purity Nickel due to concerns relating to the other producers' quality, capacity, and reliability.

32.   The vigorous and aggressive competition between Inco and Falconbridge in the production and sale of High-Purity Nickel has benefitted customers. Inco and Falconbridge have competed directly in terms of price, quality, innovation, and delivery terms.

33.   The proposed acquisition will eliminate the competition between Inco and Falconbridge, reduce the number of significant suppliers of High-Purity Nickel from three to two, and substantially increase the likelihood that Inco will unilaterally increase the price of High-Purity Nickel to a significant number of customers.

34.   Inco and Falconbridge have the ability to increase prices to certain customers of High-Purity Nickel. Some customers must purchase High-Purity Nickel because they use it in

8

super alloys used for safety-critical applications. These customers do not have the ability to substitute any other product for High-Purity Nickel. Inco and Falconbridge are able to determine their High-Purity Nickel customers' end-uses and identify which customers are purchasing High-Purity Nickel specifically for super alloys used for safety-critical applications.

35.    Inco and Falconbridge can, therefore, charge customers that are purchasing High-Purity Nickel for super alloys used for safety-critical applications a higher price than customers that are purchasing High-Purity Nickel for other uses. Without the competitive constraint of head-to-head competition between Inco and Falconbridge, Inco post-merger will have a greater ability to exercise market-power by raising prices to companies that purchase High-Purity Nickel for super alloys used for safety-critical applications.

36.    The other High-Purity Nickel producers do not have the incentive or the ability, individually or collectively, to effectively constrain a unilateral exercise of market power by Inco after the acquisition.

37.    The transaction will therefore substantially lessen competition in the market for High-Purity Nickel, which is likely to lead to higher prices, lower quality, less innovation, and less favorable delivery terms for the ultimate consumers of such products, in violation of Section 7 of the Clayton Act.

**2.    Entry is Not Likely to Deter the Exercise of Market Power.**

38.    Successful entry or expansion into the development, manufacture, and sale of High-Purity Nickel is difficult, time-consuming, and costly. Companies not currently producing nickel of any kind would require roughly three to five years and the expenditure of at least $100 million to build a refinery to produce a finished nickel product. In addition to building the

9

refinery, the new entrant, if not vertically integrated, would also have to secure nickel feedstock to refine.

39.     The cost of entering the High-Purity Nickel market is even greater than the cost of entering the refined nickel market generally. A new entrant into the High-Purity Nickel market would have to invest in additional equipment and processes to enable it to extract sufficient undesirable trace elements to produce the nickel required by makers of super alloys used for safety-critical applications. Further, if not vertically integrated, a new entrant would have to secure nickel feedstock of sufficient quality to be able to refine High-Purity Nickel.

40.     Even companies that currently produce non-High-Purity Nickel would require an investment of millions of dollars and several years to modify their facilities and processes to be capable of producing High-Purity Nickel. These companies would not invest the substantial time and money necessary to modify their facilities and processes to produce High-Purity Nickel in response to a small but significant increase in the price of High-Purity Nickel.

41.     Moreover, it is not sufficient simply to be able to produce High-Purity Nickel. A new entrant in the High-Purity Nickel market would have to be able to produce High-Purity Nickel in sufficient quantities with sufficiently consistent purity levels that customers could depend on it to provide the amounts of High-Purity Nickel needed at the appropriate time. Achieving such capability could require a substantial investment in time and money by a company seeking to enter the High-Purity Nickel market.

42.     Therefore, entry or expansion by any other firm into the High-Purity Nickel market would not be timely, likely, or sufficient to defeat an anticompetitive price increase in the event that Inco acquires Falconbridge.

10

## VI.    THE PROPOSED ACQUISITION
##         VIOLATES SECTION 7 OF THE CLAYTON ACT

43.    The proposed acquisition of Falconbridge by Inco would substantially lessen competition and tend to create a monopoly in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

44.    Unless restrained, the transaction will have the following anticompetitive effects, among others:

a.    actual and potential competition in the world market, including the United States, between Inco and Falconbridge in the development, manufacture, and sale of High-Purity Nickel will be eliminated;

b.    competition generally in the development, manufacture, and sale of High-Purity Nickel will be substantially lessened; and

c.    prices for High-Purity Nickel will likely increase, the quality of High-Purity Nickel will likely decline, innovation relating to High-Purity Nickel will likely decline, and the delivery terms currently offered in the High-Purity Nickel market will likely become less favorable to the customer.

11

## VII.   REQUEST FOR RELIEF

45.   Plaintiff requests that:

a.   Inco's proposed acquisition of Falconbridge be adjudged and decreed to be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.   defendants and all persons acting on their behalf be permanently enjoined and restrained from consummating the proposed acquisition or from entering into or carrying out any contract, agreement, plan, or understanding, the effect of which would be to combine Inco with the operations of Falconbridge;

c.   plaintiff be awarded its costs for this action; and

      d.    plaintiff receive such other and further relief as the Court deems just and proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
Thomas O. Barnett
Assistant Attorney General
D.C. Bar #426840

_____
David L. Meyer
Deputy Assistant Attorney General
for Civil Enforcement
D.C. Bar #414420

_____
J. Robert Kramer II
Director of Operations and
Civil Enforcement

_____
Maribeth Petrizzi
Chief, Litigation II Section
D.C. Bar #435204

_____
Karen Y. Phillips-Savoy
Dando B. Cellini
Jillian E. Charles (D.C. Bar #459052)
James K. Foster, Jr.
Christine A. Hill (D.C. Bar #461048/inactive)
Tara M. Shinnick
Robert W. Wilder
Attorneys
U.S. Department of Justice
Antitrust Division
Litigation II Section
1401 H Street, N.W.
Suite 3000
Washington, D.C.  20530
Tel:  (202) 307-0924

Dated: June 23, 2006

13

## APPENDIX A

## HERFINDAHL-HIRSCHMAN INDEX CALCULATIONS

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of thirty, thirty, twenty, and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated and those in which the HHI is in excess of 1800 points are considered to be highly concentrated. Transactions that increase the HHI by more than 100 points in highly concentrated markets presumptively raise antitrust concerns under the *Horizontal Merger Guidelines* issued by the U.S. Department of Justice and the Federal Trade Commission. *See Horizontal Merger Guidelines* § 1.51.