## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice<br>Antitrust Division<br>1401 H Street, N.W.<br>Suite 3000<br>Washington, DC 20530,<br><br>       Plaintiff,<br><br>       v.<br><br>INCO LIMITED,<br>145 King Street West<br>Suite 1500<br>Toronto, ON, Canada M5H 4B7,<br><br>and<br><br>FALCONBRIDGE LIMITED,<br>207 Queens Quay West<br>Suite 800<br>Toronto, ON, Canada M5J 1A7,<br><br>       Defendants. | Case No:<br><br>DECK TYPE: Antitrust<br><br>DATE STAMP: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

I.

## NATURE AND PURPOSE OF THE PROCEEDING

The United States filed a civil antitrust Complaint on June 23, 2006, seeking to enjoin the proposed acquisition by defendant Inco Limited ("Inco") of defendant Falconbridge Limited ("Falconbridge"). The Complaint alleges that the likely effect of this acquisition would be to lessen competition substantially in the development, production and sale of high-purity nickel ("High-Purity Nickel"), *i.e.*, a purer form of nickel used for certain alloys such as those used in safety-critical parts for jet engines, in violation of Section 7 of the Clayton Act. This loss of competition would likely result in higher prices, lower quality, less innovation, and less favorable delivery terms to customers in the High-Purity Nickel market.

At the same time the Complaint was filed, the United States filed a Hold Separate Stipulation and Order and a proposed Final Judgment. These are designed to eliminate the anticompetitive effects of the acquisition while permitting Inco to complete its acquisition of Falconbridge. Under the proposed Final Judgment, which is explained more fully below, Inco is required to divest assets that include Falconbridge's Nikkelverk refinery in Kristiansand, Norway ("Nikkelverk Refinery"), and Falconbridge's nickel marketing businesses. The proposed Final Judgment requires that the divestiture of these assets be made to LionOre Mining International Ltd. ("LionOre"), a company headquartered in London, United Kingdom. LionOre is not currently involved in the refining of nickel, but owns nickel mining and processing resources in Africa and Australia, and has had plans to enter the business of refining nickel and thus become a fully-integrated nickel producer. Its acquisition of the Nikkelverk refinery and the other assets included in the proposed divestiture will accelerate LionOre's becoming a fully integrated nickel producer, and make it a viable and active competitor in the High-Purity Nickel market.

2

The proposed Final Judgment requires that the divestiture to LionOre take place concurrently with the acquisition of Falconbridge by Inco. Under the terms of the Hold Separate Stipulation and Order, Falconbridge must maintain and preserve, until the acquisition is consummated, the Nikkelverk Refinery and other divestiture assets (hereafter "Divested Business") as an ongoing, economically viable competitive business. The Hold Separate Stipulation and Order further requires that, upon Inco's acquisition of the first share of Falconbridge common stock, the defendants will ensure that the Divested Business operates as an independent, economically viable ongoing competitive business, held separate and apart from Inco, and that it will remain independent and uninfluenced by Inco.

The proposed Final Judgment also provides that, if for any reason the divestiture to LionOre does not occur as required by the proposed Final Judgment, a trustee will be appointed to divest the assets to an Alternative Acquirer, which is defined as a company that is in the metals mining or processing business and is able to supply, on a long-term basis, sufficient Feedstock to assure the United States, in its sole discretion, that the Nikkelverk Refinery will remain an economically viable competitive business.

The United States and defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

II.

## DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.    *The Defendants and the Proposed Transaction*

Inco, a Canadian corporation, has its corporate headquarters and principal place of

3

business in Toronto, Ontario, Canada. As one of the largest mining companies in the world, Inco is primarily engaged in mining, processing, and refining nickel, and also produces other elements, such as cobalt and platinum group metals ("PGMs"), as by-products of its nickel production. In 2005, Inco reported total sales of approximately $4.7 billion. The company's main nickel mining, processing, and refining operations are located in Canada, although it also owns mines and processing facilities in many other parts of the world. Inco's High-Purity Nickel refining operations are located in Ontario, Canada, and Wales, United Kingdom. Inco operates in the United States through its wholly-owned subsidiary International Nickel, Inc., located at Saddlebrook, New Jersey, which markets and sells in the United States nickel and other products manufactured by Inco. Inco's High-Purity Nickel is shipped to customers all over the world, including the United States.

Falconbridge, a Canadian corporation, also has its corporate headquarters and principal place of business in Toronto, Ontario, Canada. Like Inco, Falconbridge is one of the world's largest mining companies and engages in all phases of the production of nickel and other refined elements. The main products that Falconbridge produces are nickel and copper, but the company also produces cobalt, PGMs, and other elemental metals as by-products of both its nickel and copper refining operations. In 2005, Falconbridge reported total sales of approximately $7.7 billion. Falconbridge's primary nickel mining and processing facilities are located in Ontario, Canada, although it also has such facilities worldwide. Falconbridge's only High-Purity Nickel refining operation is the Nikkelverk Refinery located in Kristiansand, Norway. The company operates in the United States through its wholly-owned subsidiary, Falconbridge U.S., Inc., located at Pittsburgh, Pennsylvania, which markets and sells in the United States nickel and other products manufactured by Falconbridge. The High-Purity Nickel produced by the Nikkelverk

4

Refinery is shipped to customers all over the world, including the United States.

Inco and Falconbridge entered into an agreement dated October 10, 2005, in which Inco stated that it intended to offer to purchase all of the common shares of Falconbridge that it did not already own. Also pursuant to that agreement, Falconbridge's Board of Directors stated that it had determined that it is in the best interests of Falconbridge to support the offer, recommend acceptance of Inco's offer to holders of the common shares of Falconbridge, and use its reasonable best efforts to permit Inco's offer to be successful, on the terms and conditions contained in the agreement. On October 24, 2005, Inco made a formal offer to purchase all of the outstanding common shares of Falconbridge in a transaction valued at over $15 billion. Inco's offer originally was open for acceptance until December 23, 2005, but this date has been extended several times, most recently to June 30, 2006. The acquisition, among other things, would combine the operations of the two leading providers of High-Purity Nickel worldwide. The United States alleges in its Complaint that this proposed transaction, as initially agreed to by the defendants, would lessen competition substantially in the market for High-Purity Nickel in violation of section 7 of the Clayton Act.

B.      The Competitive Effects of the Transaction on the High-Purity Nickel Market

Nickel is a metallic element that is particularly resistant to high temperatures, high stresses, and corrosion. Nickel is often combined with other materials to form alloys with particular performance characteristics. These performance characteristics depend on the amount of nickel and other elements contained in the particular alloy. As a general proposition, as the amount of nickel in the alloy increases, the more resistant the alloy is to heat and stress. One sub-set of nickel-based alloys is called super alloys, which generally contain between 50 and 70 percent nickel, as well as specific amounts of other elements, including iron, cobalt, and

5

chromium, that combine to give the alloy very specific performance characteristics. Super alloys are used primarily in chemical processing plants, medical applications, industrial power generation, and various aerospace applications. Many products made from super alloys, such as the rotating parts of jet engines, are considered safety-critical parts. For these parts, it is vital that, in addition to containing the proper amount of nickel, the super alloy be as free as possible from certain trace elements that could compromise the performance of the product and result in serious problems, including engine failure. The nickel that meets these demanding requirements is High-Purity Nickel. High-Purity Nickel is refined nickel of sufficient purity and chemical composition that it can be utilized for safety-critical applications. Only a small portion of the refined nickel produced in the world meets the specifications for High-Purity Nickel.

High-Purity Nickel constitutes an essential ingredient in the production of super alloys used for safety-critical applications. The Complaint alleges that a small but significant post-acquisition increase in the price of High-Purity Nickel would not cause purchasers of super alloys used for safety-critical applications to substitute non-High-Purity Nickel or elements other than nickel so as to make such a price increase unprofitable.

The Complaint also alleges that the relevant geographic market is the world, because all of the High-Purity Nickel sold in the world is mined, processed, and refined outside of the United States, and both Inco and Falconbridge sell High-Purity Nickel throughout the world. Both companies import High-Purity Nickel into the United States and sell that nickel to customers located throughout the United States.

The market for High-Purity Nickel is already highly concentrated. Inco and Falconbridge are by far the two largest producers of High-Purity Nickel sold in the United States and throughout the world. Inco and Falconbridge each account for at least 40 percent of the

6

worldwide sales of High-Purity Nickel. Combined, Inco and Falconbridge would account for over 80 percent of worldwide High-Purity Nickel sales.

Only three other companies have demonstrated any ability to produce High-Purity Nickel. While one other firm consistently produces High-Purity Nickel, its available capacity is substantially less than that of either Inco or Falconbridge, and it cannot economically increase its capacity. Two other companies have produced small amounts of High-Purity Nickel, but are not substantial competitors in the High-Purity Nickel market. While both have substantial capacity to make non-High-Purity Nickel, their current ability to make High-Purity Nickel, and to make it on a consistent basis, is very limited. The other current producers of High-Purity Nickel do not have the ability, individually or collectively, to constrain effectively a unilateral exercise of market power in High-Purity nickel by a combined Inco and Falconbridge.

As alleged in the Complaint, High-Purity Nickel customers generally view Inco's and Falconbridge's High-Purity Nickel as their only available options and do not view the products of other producers as viable alternatives due to concerns relating to the other producers' quality, capacity, and reliability. The vigorous and aggressive competition between Inco and Falconbridge in the production and sale of High-Purity Nickel has benefitted these customers, as Inco and Falconbridge have competed directly in terms of price, quality, innovation and delivery terms. The acquisition as originally proposed would eliminate all competition between Inco and Falconbridge, reduce the number of significant worldwide suppliers of High-Purity Nickel from three to two, and substantially increase the likelihood that Inco would unilaterally raise the price of High-Purity Nickel to a significant number of customers.

The Complaint also alleges that the merged firm would have the ability to increase prices to certain customers of High-Purity Nickel that must purchase High-Purity Nickel because they

use it in super alloys used for safety-critical applications, even though other customers purchase High-Purity Nickel for different uses and can often substitute non-High-Purity Nickel. The combined Inco and Falconbridge would be able to determine their High-Purity Nickel customers' end-uses and identify which customers are purchasing High-Purity Nickel specifically for super alloys used for safety-critical applications. They could, therefore, charge customers that are purchasing High-Purity Nickel for super alloys used for safety-critical applications a higher price than customers that are purchasing High-Purity Nickel for other uses.

Successful entry or expansion by another firm into the development, manufacture, and sale of High-Purity Nickel would be difficult, time-consuming, and costly. As alleged in the Complaint, companies not currently producing nickel of any kind would require roughly three to five years and the expenditure of at least $100 million to build a refinery to produce finished nickel product, and it would require even greater expenditures to enter the High-Purity Nickel market. A new entrant in the High-Purity Nickel market must invest in additional equipment and processes to extract sufficient undesirable trace elements to produce the High-Purity Nickel required by makers of super alloys used for safety-critical applications. Further, if not vertically integrated, the new entrant also must secure nickel feed sources of sufficient quality needed to make High-Purity Nickel. The United States investigated whether nickel producers not currently capable of producing High-Purity Nickel could easily enter the High-Purity Nickel market. The investigation concluded, however, that such producers would require an incremental investment of millions of dollars over several years to modify facilities and processes to become capable of producing High-Purity Nickel. A small but significant price increase in High-Purity Nickel would not be sufficient to induce these companies to invest the substantial time and money necessary to enter the High-Purity Nickel market. A new entrant in the High-Purity Nickel

8

market also must be able to produce High-Purity Nickel in sufficient quantities, and with sufficiently consistent purity levels that customers could depend on it reliably to provide the High-Purity Nickel. Therefore, entry or expansion by any other firm into the High-Purity Nickel market will not be timely, likely, or sufficient to defeat an anticompetitive price increase that would result from Inco's acquisition of Falconbridge as originally proposed.

### III.

### EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The divestiture required by the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in the market for High-Purity Nickel by establishing a new, independent, and economically viable competitor, which will include essentially all of the current nickel refining and marketing business of Falconbridge. This divestiture is designed to remedy the anticompetitive effects of the proposed transaction while preserving beneficial efficiencies that the parties anticipate achieving through the combination of the other businesses of Inco and Falconbridge. As discussed below, the proposed Final Judgment provides that LionOre shall be the Acquirer of the Divested Business. It also provides that the divestiture to LionOre must be accomplished in such a way as to demonstrate to the sole satisfaction of the United States that the Divested Business will remain viable and will remedy the competitive harm alleged in the Complaint. The divestiture must also be accomplished in a manner that satisfies the United States, in its sole discretion, that none of the terms of any agreement between LionOre and the defendants gives the defendants the ability unreasonably to raise LionOre's costs, lower LionOre's efficiency, or otherwise interfere in the ability of LionOre to compete effectively in the production and sale of High-Purity Nickel. The proposed Final Judgment also provides for continued, contractually guaranteed suitable refinery feeds ("Feedstock") to

9

Nikkelverk through the establishment and continuation of a Feedstock supply agreement between LionOre and the defendants, to supplement LionOre's own feedstock supplies.

### A. Identification of LionOre as the Purchaser of the Divested Business

A number of considerations led the United States to specifically approve and designate LionOre as the entity to whom the Divested Business should be sold. In the course of its investigation, the United States determined that competition in the High-Purity Nickel market would be most effectively preserved if the divestiture of the Nikkelverk assets were made to a purchaser that possessed its own nickel feedstock sources, thus helping to ensure that Nikkelverk would have a secure and long-term source of supply. LionOre satisfies that criterion. The defendants identified LionOre as a potential purchaser of the Divested Business that satisfies this criterion, and the United States undertook an evaluation of LionOre and determined that its ownership of Nikkelverk would preserve vigorous competition in the High-Purity Nickel market. Additionally, the defendants and LionOre had agreed on the terms of the divestiture, and entered into a number of subordinate agreements that will help ensure that LionOre will be able to operate Nikkelverk successfully.

Given the parties' agreement with LionOre and the United States' determination that the divestiture to LionOre would resolve the competitive concerns, the United States drafted the proposed Final Judgment to order the sale. Under such circumstances, the United States' competitive concerns are often resolved by a "fix-it-first" remedy.[1] A fix-it-first remedy is a structural remedy that the parties implement and the United States accepts before a merger is

---

[1] A fix-it-first remedy has several benefits, including quick and certain divestiture, removing the need for litigation, allowing the Antitrust Division to use its resources more efficiently, and saving society from incurring real costs. (*Antitrust Division Policy Guide to Merger Remedies,* Section IV.A, p. 27)

10

consummated. In such a case, there is no need for the United States to file a Complaint to preserve competition. In this case, however, two aspects of the remedy led the United States to seek entry of a Final Judgment to ensure Court oversight of the defendants' fulfillment of their commitments. *(Antitrust Division Policy Guide to Merger Remedies*, Section IV.A, p. 28.) First, preservation of competition required not only that the Nikkelverk assets be divested, but that the defendants continue to supply feedstock to Nikkelverk for a number of years. (This part of the remedy is described in more detail in Section III.C. below.) Second, in order to expedite its purchase, LionOre will be issuing stock to Falconbridge, subject to the requirement that defendants sell within 150 days any shares of LionOre that it receives as partial payment for the sale of the Divested Business. To ensure compliance with these ongoing commitments, the United States determined that a traditional "fix-it-first" remedy would not be appropriate, and that it would be necessary to seek entry of the proposed Final Judgment.

Because this is not a traditional fix-it-first remedy, the United States also determined that the proposed Final Judgment should anticipate the possibility, however remote, that for some reason the sale to LionOre does not take place. Section V of the proposed Final Judgment therefore requires that, if the divestiture to LionOre does not occur in the manner called for in Section IV, a trustee will be appointed to sell the assets to an Alternative Acquirer. For the most part, the assets to be divested, and the Defendants' obligations regarding the divestiture, are the same whether the sale is made to LionOre under Section IV or an Alternative Acquirer under Section V. However, since, unlike LionOre, an Alternative Acquirer has not already entered into agreements with the defendants, the proposed Final Judgment gives the Alternative Acquirer the option to enter into such agreements, including the ability to choose among several options, as discussed below, regarding the manner in which third-party feedstocks will be secured.

11

### B.  Assets

The Divested Business as defined in the proposed Final Judgment means Falconbridge Nikkelverk A/S (the Nikkelverk Refinery in Norway), Falconbridge's three current nickel marketing arms (Falconbridge, U.S., Inc.; Falconbridge Europe S.A.; and Falconbridge (Japan) Limited), Falconbridge International Limited ("FIL"), the Falconbridge subsidiary responsible for the current acquisition of feedstock from third parties, and related assets.  The proposed Final Judgment includes a complete descriptive list of related divestiture assets designed to enable the Divested Business to compete vigorously.[2]  In summary, the list of divested assets includes all tangible assets used in the development, production, servicing, and sale of the products currently made at the Nikkelverk Refinery ("Nikkelverk Refinery Products"); and all intangible assets that have been used exclusively or primarily in the development, production, servicing, and sale of products, including but not limited to all intellectual property, and trade names (including the product or trade name "SuperElectro").  With respect to any other intangible assets that are used by the Divested Business and also have been used by Falconbridge's other businesses (*i.e.*, the non-Divested Business), LionOre may obtain a non-exclusive, non-transferable, fully paid-up license for such intangible assets (including the use of the name "Falconbridge").  In addition, the proposed Final Judgment requires Inco to provide information to LionOre about current employees to enable LionOre to make offers of employment.  The defendants will not interfere with any negotiations by LionOre to employ any of Falconbridge's employees whose responsibilities include the research, development, production, operation, or sale of the products

---

[2]  The assets to be divested to an Alternative Acquirer, defined as the Alternative Divested Business, are the same as those to be divested to LionOre, except that FIL is not included.  The proposed Final Judgment gives the Alternative Acquirer the option of acquiring FIL, but does not require the acquisition; LionOre has already chosen to acquire FIL.

of the Divested Business, or procurement of Feedstock from third parties. As noted above, the defendants bear these obligations whether the sale is made to LionOre under Section IV, or to an Alternative Acquirer under Section V.

The United States is satisfied that LionOre possesses the incentive and capability to use the Divested Business to compete successfully in the High-Purity Nickel market. The proposed Final Judgment provides that the United States must also be satisfied that the manner in which the divestiture to LionOre is accomplished, and any agreements between the defendants and LionOre, do not interfere with the ability of LionOre to compete successfully in that market.

C.    *Feedstock Supply*

As part of the divestiture, the proposed Final Judgment also addresses the potential need for LionOre to have reliable and sufficient Feedstock supply for the Divested Business. This is accomplished in three ways. First, Inco has entered into a supply agreement ("Supply Agreement") with LionOre by which Inco commits to supply Feedstock, produced by Inco, to be used in operating the Nikkelverk Refinery. Second, Inco has agreed to divest to LionOre the Falconbridge group that is responsible, in part, for procuring feedstock for Nikkelverk from third parties along with existing third-party supply agreements. Third, as a miner and processor of nickel, including feedstock currently refined at Nikkelverk, LionOre has current and long-term access to feedstock of its own.

Under the Supply Agreement provision, it is the option of LionOre to procure from Inco the same or substantially the same quality and volume of Feedstock provided by Falconbridge to the Nikkelverk Refinery. Currently, Falconbridge provides about 70% of the Feedstock for the Nikkelverk Refinery from its own operations. At the option of LionOre, such Supply Agreement may have a term of up to ten years. The terms and conditions of the Supply Agreement must be

13

commercially reasonable and designed to enable LionOre to compete effectively in the sale of

High-Purity Nickel, and must be approved by the United States in its sole discretion. The

proposed Final Judgment also provides that Inco give the United States thirty days notice before

implementing any material change to the Supply Agreement related to the length of the Supply

Agreement, to the volume and quality of the Feedstock, or price, and further provides that Inco in

the performance of the Supply Agreement will take no action to interfere with LionOre's ability

to compete.

Although the Antitrust Division generally disfavors long-term supply agreements, the

Division has agreed to a long-term supply agreement here for three reasons. First, long-term

supply agreements are common in this industry and may be necessary to ensure LionOre's ability

to compete effectively. Second, the agreement is structured in a way that minimizes the potential

risks normally associated with supply agreements. Third, the use of a supply agreement

preserves substantial efficiencies the parties anticipate from the Inco/Falconbridge acquisition.

Providing LionOre the option of obtaining nickel feedstock from Inco through the Supply

Agreement may be critical to its ability to compete effectively. Supply agreements of up to

fifteen or twenty years are not uncommon in this industry because refineries are configured to

process feedstock from specific sources, and a long-term relationship encourages and ensures

long-term profitability as capital expenditures are made to the refinery to suit the feedstock. In

this instance, moreover, a long-term supply agreement provides LionOre time to develop and

adapt the Nikkelverk Refinery to new feedstock sources. LionOre will have incentives to make

this transition, but the ten-year Supply Agreement ensures that sufficient time is available for

LionOre to compete effectively while developing its own sources and establishing relationships

with new third-party sources of feedstock. It is contemplated that LionOre will over time supply

14

increasing portions of the Nikkelverk feedstock from its own mines and processing facilities, and will eventually be able to operate Nikkelverk without the need for any Inco feedstock. Until that occurs, however, it is important to ensure that Nikkelverk will have the same quality and quantity of feedstock that it currently obtains from Falconbridge.

The Supply Agreement between Inco and LionOre ensures that Inco will not be able to disadvantage the Nikkelverk Refinery through Feedstock pricing or quality, or by supply disruptions, and should not facilitate anticompetitive collusion between Inco and the Nikkelverk refinery. Moreover, key provisions of the agreement are expected to check the ability of Inco to abuse the supply relationship with LionOre. The price LionOre will pay Inco for Feedstock has been set through negotiations between Inco and LionOre, and any price changes will be linked directly to changes in the price for finished nickel as published independently by the London Metal Exchange. This will further ensure that Inco, as required under the proposed Final Judgment, can take no pricing action under the Supply Agreement to interfere with or impede the ability of LionOre to compete effectively in the sale of High-Purity Nickel. Regarding the quality of Feedstock or other performance under the Supply Agreement, contract specifications for Feedstock are well-defined and chemically measurable, and inferior quality or performance will be easily detected and remedied.

The fact that High-Purity Nickel is a relatively small part of total Nikkelverk Refinery sales would make it difficult for Inco to harm competition in the High-Purity Nickel market by disrupting supply to Nikkelverk. If Inco cut a portion of feedstock supply, the Nikkelverk Refinery easily could maintain its output of High-Purity Nickel using its feedstock used for other nickel.

15

Nor will the Supply Agreement facilitate anticompetitive collusion between Inco and LionOre. There appear to be no structural reasons to anticipate that, in an industry where feedstock is generally destined for many end-uses of nickel, Inco could use the supply contract to coordinate with LionOre to unlawfully restrain trade in the High-Purity Nickel market. Although Inco will supply up to 70% of the Nikkelverk Refinery's feedstock, it will have incomplete information about the Nikkelverk Refinery's other sources of feedstock, and no information about its total production, product mix, and prices.[3]

The other sources of suitable feedstock for the new firm will be LionOre itself and third parties. Currently, third parties, including a company partly owned by LionOre, provide about 30% of the Nikkelverk Refinery's Feedstock pursuant to long term contracts with Falconbridge. Under the proposed Final Judgment, LionOre will acquire Falconbridge International Limited ("FIL"). FIL is a Barbados corporation and is the subsidiary of Falconbridge responsible, in part, for the current acquisition of Feedstock from third parties. By acquiring FIL, LionOre will also be acquiring the Third-Party Supply Agreements that have been made with FIL, which currently represent thirty percent of Nikkelverk's total feedstock supply.

The Supply Agreement with Inco, the acquisition of FIL and its existing third-party feedstock, and LionOre's own substantial feedstock resources will ensure that LionOre has sufficient Feedstock at commercial terms to operate the Divested Business as a viable, ongoing business that can stand in the position of today's Falconbridge, and thereby compete effectively in the High-Purity Nickel market.

---

[3] It is also important to note that in this industry supply agreements are common and appear to work well. Indeed, Nikkelverk currently relies on such contracts for much of the feedstock that it uses.

16

An Alternative Acquirer who purchases the Alternative Divested Business from the trustee will also have the option of entering into a Supply Agreement of up to ten years. The Alternative Acquirer will be a company that is in the metals mining or processing business and able to supply on a long-term basis, sufficient Feedstock to assure the United States, in its sole discretion, that the Nikkelverk Refinery will be a viable competitive business. An Alternative Acquirer will also have the option to obtain the right to third-party feedstock comparable to that provided by Falconbridge's interest in existing third-party supply agreements, although it would not be required to do so by acquiring FIL as part of the divested assets. It may instead choose to provide for third-party feedstock supply through the defendants' assigning existing third-party agreements to the Alternative Acquirer, or by the defendants entering into new agreements with the Alternative Acquirer to procure third-party feedstock.

Securing access to feedstock in the manner provide by the proposed Final Judgment is more advantageous than the divestiture of one or more mines that are currently used to supply Nikkelverk. The combination of the Inco and Falconbridge mines in Ontario is the source of a substantial portion of the efficiencies that the parties anticipate they will realize via the proposed acquisition. Therefore, it is appropriate to craft a remedy that preserves competition without unnecessarily disrupting potential efficiencies.

D.    *Timing of the Divestiture*

In antitrust cases involving mergers in which the United States seeks a divestiture remedy, it requires completion of the divestiture within the shortest time period reasonable under the circumstances. In this case, because Inco and Falconbridge have significant sales and operations in Europe as well as the United States, the European Commission must also review

17

Inco's proposed acquisition of Falconbridge. The proposed Final Judgment requires that, if Inco assumes control of Falconbridge, it must concurrently divest the Divested Business to LionOre as required by the proposed Final Judgment. During the period before Inco consummates the transaction with Falconbridge, a Hold Separate Stipulation and Order will preserve the assets to be divested, and require that Inco and Falconbridge continue to operate them as an independent competitor in the High-Purity Nickel market. During this time, Inco and Falconbridge are required to take the necessary steps to ensure that the assets remain an economically viable and ongoing business concern that is not influenced by the consummation of the acquisition, and otherwise maintain all competition during the pendency of the ordered divestiture.

The United States and the defendants fully expect that the divestiture to LionOre will take place. In the event that it does not, however, the proposed Final Judgment provides that a trustee will be appointed to sell the Alternative Divested Business. If the trustee has not effected a divestiture within six months of the trustee's appointment, the trustee shall file a report with the Court, and the Court shall thereafter enter whatever orders may be necessary to carry out the purposes of the proposed Final Judgment.

### E. Financing

The Division has never favored seller financing of divestitures, because such arrangements create an avenue for the seller to influence the business decisions of the company to whom the assets have been sold. In some cases, it may also signal that the proposed purchaser has insufficient resources to be a viable competition.

In this case, although LionOre will finance the majority of its acquisition of the divested business on its own, the purchase agreement between Falconbridge and LionOre contemplates a

18

partial payment to Falconbridge in the form of LionOre stock. The proposed Final Judgment

provides, however, that any issuance of LionOre stock to Falconbridge must be strictly limited to

no more than 19.99% or 49,118,057 shares, defendants are not permitted to exercise any voting

or control rights associated with those shares, and, perhaps most importantly, defendants must

divest themselves completely of those shares within 150 days of the divestiture of Nikkelverk to

LionOre. Under these circumstances, the Division determined that there was no possibility that

the dangers associated with seller financing could materialize, and that the short-term issuance of

these shares to Falconbridge created no risk to competition. In addition, the Division determined

that the short-term issuance of LionOre stock was necessitated by the proposed speed of the

divestiture, to take place immediately upon the success of Inco's tender offer. The Division

determined that with a longer divestiture period, LionOre was fully able to finance the

transaction without resorting to the issuance of stock to Falconbridge.

V.

## REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act (15 U.S.C. § 15) provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable

attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing

of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act

(15 U.S.C. § 16(a)), the proposed Final Judgment has no *prima facie* effect in any subsequent

private lawsuit that may be brought against the defendants.

V.

## PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the Federal Register. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Maribeth Petrizzi
> Chief, Litigation II Section
> 1401 H St. N.W., Suite 3000
> Antitrust Division
> United States Department of Justice
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the proposed Final Judgment.

20

VI.

## ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Inco's acquisition of Falconbridge. The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will preserve competition for the provision of High-Purity Nickel as it existed prior to the proposed acquisition, and that such a remedy would achieve all or substantially all the relief the government would have obtained through litigation, but avoids the time and expense of a trial.

VII.

## STANDARD OF REVIEW UNDER THE APPA
## FOR THE PROPOSED FINAL JUDGMENT

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court shall consider:

(A)   the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)   the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). As the United States Court of Appeals for the District of

Columbia Circuit has held, the APPA permits a court to consider, among other things, the

relationship between the remedy secured and the specific allegations set forth in the

government's complaint, whether the decree is sufficiently clear, whether enforcement

mechanisms are sufficient, and whether the decree may positively harm third parties. *See United

States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

"Nothing in this section shall be construed to require the court to conduct an evidentiary

hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). Thus, in

conducting this inquiry, "[t]he court is nowhere compelled to go to trial or to engage in extended

proceedings which might have the effect of vitiating the benefits of prompt and less costly

settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of

Senator Tunney).[4] Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in
> making its public interest finding, should . . . carefully consider the explanations of the
> government in the competitive impact statement and its responses to comments in order
> to determine whether those explanations are reasonable under the circumstances.

*United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D.

Mo. 1977).

---

[4] *See United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (recognizing it
was not the court's duty to settle; rather, the court must only answer "whether the settlement
achieved [was] within the reaches of the public interest"). A "public interest" determination can
be made properly on the basis of the Competitive Impact Statement and Response to Comments
filed by the Department of Justice pursuant to the APPA. Although the APPA authorizes the use
of additional procedures, 15 U.S.C. § 16(f), those procedures are discretionary. A court need not
invoke any of them unless it believes that the comments have raised significant issues and that
further proceedings would aid the court in resolving those issues. *See* H.R. Rep. No. 93-1463,
93rd Cong., 2d Sess. 8-9 (1974), *reprinted* in 1974 U.S.C.C.A.N. 6535, 6538.

Accordingly, with respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[5]

The proposed Final Judgment, therefore, should not be reviewed under a standard of whether it is certain to eliminate every anticompetitive effect of a particular practice or whether it mandates certainty of free competition in the future. Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. AT&T*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F. Supp. at 716), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985)

---

[5] *Cf. BNS*, 858 F.2d at 463 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *Gillette*, 406 F. Supp. at 716 (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

23

(approving the consent decree even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60.

## VIII.

## DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: June 23, 2006

Respectfully submitted,

Karen Phillips-Savoy
Dando Cellini
Jillian Charles
James Foster
Christine Hill
Tara Shinnick
Robert Wilder
U.S. Department of Justice
Antitrust Division, Litigation II Section
Washington, DC 20530