UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 1:06CV01151 |
| Plaintiff, | ) | |
| | ) | Judge: Rosemary Collyer |
| v. | ) | |
| | ) | |
| INCO LIMITED, and | ) | DECK TYPE: Antitrust |
| FALCONBRIDGE LIMITED, | ) | |
| | ) | |
| | ) | DATE STAMP: 06/23/2006 |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on June 23, 2006, and plaintiff and defendants, Inco Limited and Falconbridge Limited, by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants to assure that competition is not substantially lessened;

AND WHEREAS, plaintiff requires defendants to make certain divestitures and enter into the Supply Agreement and provide any Alternative Acquirer the Third-Party Feedstock Option

for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures, the Supply Agreement, and the Third-Party Feedstock Option required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II. Definitions

As used in this Final Judgment:

A.    "Acquirer" means LionOre, the entity to whom defendants shall divest the Divested Business.

B.    "Acquirer Shares" means the issuance to Falconbridge of no more than 19.99 percent or 49,118,057 of the outstanding common shares of the Acquirer at the completion of the purchase and sale of the Divested Business to the Acquirer.

C.    "Acquisition of Falconbridge" means: (a) the condition that Inco has taken up and paid for such number of Falconbridge common shares, validly deposited and not withdrawn at the expiry time of Inco's Offer to Purchase all of the Outstanding Shares of Falconbridge, dated

2

October 24, 2005, as amended, that, together with any Falconbridge common shares directly or indirectly owned by Inco, constitutes at least 50.01% of the Falconbridge common shares on a fully-diluted basis at the expiry time or (b) Inco's acquisition of control of Falconbridge by any other means.

D.      "Alternative Acquirer" means an Acquirer other than LionOre that is in the metals mining or processing business and is able to supply, on a long-term basis, sufficient Feedstock to assure the United States, in its sole discretion, that the Nikkelverk Refinery will remain an economically viable competitive business.

E.      "Alternative Divested Business" means Falconbridge Nikkelverk A/S, Falconbridge, U.S., Inc. ("FUS"), Falconbridge Europe S.A. ("FESA"), and Falconbridge (Japan) Limited ("FJKK"), including:

1.      all tangible assets used in the development, production, servicing, and sale of the Nikkelverk Refinery Products, including but not limited to the Nikkelverk Refinery; all real property; any facilities used for research, development, and engineering support, and any real property associated with those facilities; manufacturing and sales assets, including capital equipment, vehicles, supplies, personal property, inventory, office furniture, fixed assets and fixtures, materials, on- or off-site warehouses or storage facilities, and other tangible property or improvements; all licenses, permits and authorizations issued by any governmental organization; all contracts, agreements, leases, commitments, and understandings; all customer contracts, lists, accounts, and credit records;

3

and other records relating to the Alternative Divested Business;

2.    all intangible assets that have been used exclusively or primarily in the development, production, servicing, and sale of the Nikkelverk Refinery Products, including but not limited to all patents, licenses and sublicenses, intellectual property, trademarks, trade names, service marks, service names (including the product or trade name "SuperElectro" or any variation thereof), technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information provided to the employees, customers, suppliers, agents or licensees of the Alternative Divested Business, provided that with respect to any such intangible assets relating to metal separation or purification processes, at the option of the Alternative Acquirer defendants may retain a non-exclusive, non-transferable, fully paid-up license(s) to or copy of such intangible assets;

3.    a non-exclusive, non-transferable, fully paid-up license(s) for the use of the name "Falconbridge," the duration and terms of which shall be negotiated by the defendants and the Alternative Acquirer and limited to the field of use of the Nikkelverk Refinery Products, provided that any such license(s) may be transferable to any future purchaser of the

4

Nikkelverk Refinery;

4.    a non-exclusive, non-transferable, fully paid-up license(s) for use of any intangible asset that has been used by both the Alternative Divested Business and any of Falconbridge's non-divested businesses, provided that such license(s) may be transferable to any future purchaser of Nikkelverk Refinery; and

5.    all research data concerning historic and current research and development efforts conducted at or for the Alternative Divested Business, including designs of experiments, and the results of unsuccessful designs and experiments.

The term "Alternative Divested Business" shall not include tangible or intangible assets exclusively used in, or personnel exclusively responsible for, the production or sale of products other than the Nikkelverk Refinery Products.

F.    "Alternative Supply Agreement" means an agreement between Inco and the Alternative Acquirer on the terms described in Section V(B) by which Inco commits to supply to the Alternative Acquirer, other than through a New Third-Party Supply Agreement, Feedstock to be used in operating the Nikkelverk Refinery.

G.    "Divested Business" means Falconbridge Nikkelverk A/S, Falconbridge, U.S., Inc. ("FUS"), Falconbridge Europe S.A. ("FESA"), Falconbridge (Japan) Limited ("FJKK"), and Falconbridge International Limited ("FIL"), including:

1.    all tangible assets used in the development, production, servicing, and sale of the Nikkelverk Refinery Products, including but not limited to the

5

Nikkelverk Refinery; all real property; any facilities used for research, development, and engineering support, and any real property associated with those facilities; manufacturing and sales assets, including capital equipment, vehicles, supplies, personal property, inventory, office furniture, fixed assets and fixtures, materials, on- or off-site warehouses or storage facilities, and other tangible property or improvements; all licenses, permits and authorizations issued by any governmental organization; all contracts, agreements, leases, commitments, and understandings; all customer contracts, lists, accounts, and credit records; and other records relating to the Divested Business;

2.      all intangible assets that have been used exclusively or primarily in the development, production, servicing, and sale of the Nikkelverk Refinery Products, including but not limited to all patents, licenses and sublicenses, intellectual property, trademarks, trade names, service marks, service names (including the product or trade name "SuperElectro" or any variation thereof), technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information provided to the employees, customers, suppliers, agents or licensees of the Divested

6

Business, provided that with respect to any such intangible assets relating

to metal separation or purification processes, at the option of the Acquirer

defendants may retain a non-exclusive, non-transferable, fully paid-up

license(s) to or copy of such intangible assets;

3.    a non-exclusive, non-transferable, fully paid-up license(s) for the use of

the name "Falconbridge," the duration and terms of which shall be

negotiated by the defendants and the Acquirer and limited to the field of

use of the Nikkelverk Refinery Products, provided that any such license(s)

may be transferable to any future purchaser of the Nikkelverk Refinery;

4.    a non-exclusive, non-transferable, fully paid-up license(s) for use of any

intangible asset that has been used by both the Divested Business and any

of Falconbridge's non-divested businesses, provided that such license(s)

may be transferable to any future purchaser of Nikkelverk Refinery;  and

5.    all research data concerning historic and current research and

development efforts conducted at or for the Divested Business, including

designs of experiments, and the results of unsuccessful designs and

experiments.

The term "Divested Business" shall not include tangible or intangible assets exclusively used in,

or personnel exclusively responsible for, the production or sale of products other than the

Nikkelverk Refinery Products.

H.    "Existing Third-Party Supply Agreements" means existing agreements between

Falconbridge and third parties for the supply of Feedstock for the Nikkelverk Refinery that is

7

produced by persons other than the defendants.

I.    "Falconbridge" means defendant Falconbridge Limited, a Canadian corporation with its headquarters in Toronto, Canada, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

J.    "Falconbridge International Limited" means a corporation organized under the laws of Barbados and a subsidiary of Falconbridge responsible, in part, for the acquisition of Feedstock from third parties.

K.    "Feedstock" means nickel-in-matte and other products and intermediate compounds constituting refinery feed sources suitable for refining at Nikkelverk Refinery.

L.    "Foreign Competition Clearance" means an action or inaction by the European Commission that results in the termination of any relevant waiting period, or grant of approval, clearance or consent, that is applicable to the acquisition of Falconbridge by Inco.

M.    "High-Purity Nickel" means refined nickel of sufficient purity and chemical composition that it can be utilized in super alloys used for safety-critical applications.

N.    "Inco" means defendant Inco Limited, a Canadian corporation with its headquarters in Toronto, Canada, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

O.    "LionOre" means LionOre Mining International Limited, a Canadian corporation with its headquarters in London, England, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers,

managers, agents, and employees.

P.      "New Third-Party Supply Agreement" means one or more agreements between the defendants and the Alternative Acquirer on the terms described in Section V for the supply to the Nikkelverk Refinery of Feedstock that is produced by persons other than the defendants.

Q.      "Nikkelverk Refinery" means the nickel, copper, cobalt, and precious metals refinery owned by Falconbridge's subsidiary Falconbridge Nikkelverk A/S and located in Kristiansand, Norway.

R.      "Nikkelverk Refinery Products" means the finished nickel, copper, cobalt, precious metals, and other products produced at the Nikkelverk Refinery.

S.      "Supply Agreement" means an agreement between Inco and the Acquirer on the terms described in Section IV by which Inco commits to supply to the Acquirer, other than through a New Third-Party Supply Agreement, Feedstock to be used in operating the Nikkelverk Refinery.

T.      "Third-Party Feedstock Option" means one or more of the options available to the Alternative Acquirer in Section V(A)(3) to obtain the quantities and quality of Feedstock supplied pursuant to the Existing Third-Party Supply Agreements.

### III. Applicability

A.      This Final Judgment applies to Inco and Falconbridge, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.      Defendants shall require, as a condition of the sale or other disposition of all or substantially all of their assets or of lesser business units that include the Divested Business, that

9

the purchaser agrees to be bound by the provisions of this Final Judgment.

## IV. Divestiture

A.    In the event that Inco acquires any shares pursuant to Inco Limited Offer to Purchase All of the Outstanding Shares of Falconbridge Limited dated October 24, 2005, as amended, defendants are ordered and directed concurrently with Inco's Acquisition of Falconbridge, (1) to divest the Divested Business to the Acquirer in a manner consistent with this Final Judgment, and (2) to enter into the Supply Agreement with the Acquirer. Defendants shall, as soon as possible, but within one business day after the Acquisition of Falconbridge, notify the United States of (1) the effective date of the Acquisition of Falconbridge and (2) the effective date that the Divested Business was divested to the Acquirer.

B.    Defendants shall provide the United States and the Acquirer information relating to the personnel employed by the Divested Business or involved exclusively or primarily in research, development, production, operation, and sale of the Nikkelverk Refinery Products or procurement of Feedstock from third parties for the Divested Business, to enable the Acquirer to make offers of employment. Defendants will not interfere with any negotiations by the Acquirer to employ any of the defendants' employees whose responsibilities exclusively or primarily involve the research, development, production, operation, or sale of the products of the Divested Business or procurement of Feedstock from third parties for the Divested Business.

C.    Defendants shall permit the Acquirer to have reasonable access to personnel and to make inspections of the physical facilities of the Divested Business; access to any and all environmental, zoning, and other permit documents and information; access to any and all financial, operational, or other documents and information customarily provided as part of a due

10

diligence process; and any documents and information the Acquirer shall consider relevant to any issues relating to the Supply Agreement.

D.     Defendants shall warrant to the Acquirer that each asset that was operational as of the date of filing of the Complaint in this matter will be operational on the date of divestiture.

E.     Defendants shall enter into the Supply Agreement with the Acquirer to provide Feedstock of the same or substantially the same quality and volume provided by Falconbridge to be used in operating the Nikkelverk Refinery. At the option of the Acquirer, such Supply Agreement may have a term of up to ten (10) years. The terms and conditions of the Supply Agreement must be commercially reasonable and designed to enable the Acquirer to compete effectively in the sale of High-Purity Nickel. The terms and conditions of the Supply Agreement must be approved by the United States in its sole discretion. Inco shall give the United States 30 calendar days notice before exercising any contract right to cancel or terminate the Supply Agreement and before implementing any material change to any term related to the length of the Supply Agreement, the volume and quality of the Feedstock, or the price. In the performance of the Supply Agreement, defendants shall take no action the effect of which is to interfere with or impede the ability of the Acquirer to compete effectively in the sale of High-Purity Nickel.

F.     Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divested Business.

G.     Defendants shall warrant to the Acquirer that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Divested Business, and that following the sale of the Divested Business, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation

11

of the Divested Business.

H.    Nothing in this Final Judgment shall be construed to require the Acquirer as a condition of any license granted by or to defendants pursuant to Sections II (G)(2) - (4) to extend to defendants the right to use the Acquirer's improvements to processes used in the production of Nikkelverk Refinery Products.

I.    Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV of this Final Judgment shall include the entire Divested Business and the Supply Agreement, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divested Business can and will be used by the Acquirer as part of a viable, ongoing business, engaged in producing High-Purity Nickel for sale worldwide, including the United States. The divestiture shall be accomplished so as to satisfy the United States, in its sole discretion, that:

   1. the Divested Business will remain viable and the divestiture of the Divested business will remedy the competitive harm alleged in the Complaint; and

   2. none of the terms of any agreement between the Acquirer and defendants give defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or to otherwise interfere in the ability of the Acquirer to compete effectively in the production and sale of High-Purity Nickel.

### V. Appointment of Trustee to Effect Divestiture

A.    If defendants have not divested the Divested Business as specified in Section

12

IV(A), defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court (1) to divest the Alternative Divested Business in a manner consistent with this Final Judgment to an Alternative Acquirer acceptable to the United States in its sole discretion, (2) at the option of the Alternative Acquirer, to effectuate the Alternative Supply Agreement between the defendants and the Alternative Acquirer, and (3) except for those Existing Third-Party Supply Agreements under which Feedstocks are contractually obligated to be processed at the Nikkelverk Refinery, to (a) effectuate, at the option of the Alternative Acquirer, the New Third-Party Supply Agreement between the defendants and the Alternative Acquirer, (b) oversee the defendants's best efforts to procure the assignment of the Existing Third-Party Supply Agreements, (c) order the divestiture of Falconbridge International Limited, or (d) some combination of these options, to ensure that the Alternative Acquirer obtains the quantities and quality of Feedstock to be supplied pursuant to the Existing Third-Party Supply Agreements consistent with the remaining term of each of the Existing Third-Party Supply Agreements. In the event the European Commission also requires the divestiture of the same assets, the United States shall consult in good faith with the European Commission to ensure selection of a trustee acceptable to both the United States and the European Commission.

B.      At the option of the Alternative Acquirer, defendants shall enter into the Alternative Supply Agreement with the Alternative Acquirer to provide Feedstock of the same or substantially the same quality and volume provided by Falconbridge to be used in operating the Nikkelverk Refinery. At the option of the Alternative Acquirer, such Alternative Supply Agreement may have a term of up to ten (10) years. The terms and conditions of the Alternative

Supply Agreement must be commercially reasonable and designed to enable the Alternative

Acquirer to compete effectively in the sale of High-Purity Nickel. The terms and conditions of

the Alternative Supply Agreement must be approved by the United States in its sole discretion.

Inco shall give the United States 30 calendar days notice before exercising any contract right to

cancel or terminate the Alternative Supply Agreement and before implementing any material

change to any term related to the length of the Alternative Supply Agreement, the volume and

quality of the Feedstock, or the price. In the performance of the Alternative Supply Agreement,

defendants shall take no action the effect of which is to interfere with or impede the ability of the

Alternative Acquirer to compete effectively in the sale of High-Purity Nickel.

      C.      Unless the United States otherwise consents in writing, the divestiture pursuant to

Section V of this Final Judgment shall include the entire Alternative Divested Business,

Alternative Supply Agreement, and Third-Party Feedstock Option, and shall be accomplished in

such a way as to satisfy the United States, in its sole discretion, that the Alternative Divested

Business can and will be used by the Alternative Acquirer as part of a viable, ongoing business,

engaged in producing High-Purity Nickel for sale worldwide, including the United States. A

divestiture pursuant to Section V of this Final Judgment, shall be accomplished so as to satisfy

the United States, in its sole discretion, that:

          1.      the Alternative Acquirer has the intent and capability (including the

                 necessary managerial, operational, technical and financial capability) to

                 compete effectively in the production and sale of High-Purity Nickel; and

          2.      that none of the terms of any agreement between the Alternative Acquirer

                 and defendants give defendants the ability unreasonably to raise the

14

Alternative Acquirer's costs, to lower the Alternative Acquirer's efficiency, or otherwise to interfere in the ability of the Alternative Acquirer to compete effectively in the production and sale of High-Purity Nickel; and

3.    the Alternative Divested Business will remain viable and the divestiture of the Alternative Divested Business will remedy the competitive harm alleged in the Complaint.

D.    Nothing in this Final Judgment shall be construed to require the Alternative Acquirer as a condition of any license granted by or to defendants pursuant to Sections II (E)(2) - (4) to extend to defendants the right to use the Alternative Acquirer's improvements to processes used in the production of Nikkelverk Refinery Products.

E.    With respect to any divestiture to an Alternative Acquirer under Section V of this Final Judgment, defendants shall have the same obligations to the Alternative Acquirer with respect to the Alternative Divested Business as they do to the Acquirer with respect to the Divested Business as set forth in Sections IV(B), (C), (D), (F), and (G) of the Final Judgment.

F.    After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Alternative Divested Business. The trustee shall have the power and authority to accomplish the divestiture to an Alternative Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections V and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Section V(H) of this Final Judgment, the trustee may hire at the cost and expense of defendants any investment bankers, attorneys, or other

15

agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

G.    Defendants shall not object to a sale by the trustee, or to the Alternative Supply Agreement or the Third-Party Feedstock Option ordered by the trustee, on any ground other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

H.    The trustee shall serve at the cost and expense of defendants, on such terms and conditions as plaintiff approves, and shall account for all monies derived from the sale of the Alternative Divested Business and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Alternative Divested Business and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

I.    Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to customary

16

confidentiality protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

J.      After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Alternative Divested Business and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Alternative Divested Business.

K.      If the trustee has not accomplished such divestiture within six months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the plaintiff who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

17

## VI. Notice of Proposed Divestiture

A.      Within two (2) business days following execution of a definitive divestiture agreement, the trustee shall notify the United States and the defendants of any proposed divestiture required by Section V of this Final Judgment. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Alternative Divested Business, together with full details of the same.

B.      Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from defendants, the proposed Alternative Acquirer, any other third party, or the trustee if applicable, additional information concerning the proposed divestiture, the proposed Alternative Acquirer, and any other potential Alternative Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.      Within (a) thirty (30) calendar days after receipt of the notice or (b) twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the proposed Alternative Acquirer, any third party, or the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section V(G) of this Final Judgment. Absent written notice that the United States does not object to the proposed Alternative Acquirer or upon objection by the United States, a divestiture proposed under Section V shall not be consummated.

18

Upon objection by defendants under Section V(G), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. Financing

To the extent that defendants are issued Acquirer Shares pursuant to the Agreement to Acquire the Divested Business Through Purchase of FNA Group Shares dated June 6, 2006 between Falconbridge and LionOre, or otherwise, in exchange for financing part of the Acquirer's acquisition of the Divested Business, defendants:

1.    shall, within 150 days after the earlier of (a) the Acquisition of Falconbridge, or (b) the issuance of the Acquirer Shares, divest in a manner consistent with this Final Judgment all of the Acquirer Shares;

2.    shall divest the Acquirer Shares by open market sale, public offering, private sale, repurchase by LionOre, or a combination thereof. The divestiture of the Acquirer Shares shall not be made: (i) to any person other than LionOre who provides High-Purity Nickel unless the United States shall otherwise agree in writing; or (ii) in a manner that, in the sole judgment of the United States, could significantly impair LionOre as an effective competitor in the production and sale of High-Purity Nickel;

3.    shall not be issued more than the Acquirer Shares;

4.    shall not exercise any rights relating to the Acquirer Shares, including but not limited to (i) exercising or permitting the exercise of any voting rights, (ii) electing, nominating, appointing, or otherwise designating or participating as officer or directors; (iii) participating, as a member of the

19

Board of Directors or otherwise, in any meeting of the Board of Directors, (iv) participating in any committees or other governing body of LionOre; (v) exercising any veto rights with respect to the business of LionOre, including veto power over changes in control of LionOre, over significant asset purchases or sales, over change in majority of board membership, or over changes in majority ownership of LionOre; (vi) obtaining any financial or business information with respect to LionOre that is not otherwise publicly available. In no event shall defendant influence or attempt to influence the decision-making, management, or policies of LionOre; and

5.    shall not acquire, directly or indirectly, any shares of, or other ownership interest in, LionOre, within two years of divesting the Acquirer Shares.

## VIII. Hold Separate

Until the divestiture required by this Final Judgment has been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. Affidavits

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or Section V, defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or Section V of this Final Judgment. Every twelve

(12) months following completion of the divestiture required by Section IV or Section V, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section IV(E) or Section V(B) of this Final Judgment, including compliance with the Supply Agreement. Defendants shall, in addition, deliver to the United States an affidavit describing any changes to the Supply Agreement outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

B.      Defendants shall keep all records of all efforts made to preserve the Divested Business and to divest the Divested Business until one year after such divestiture has been completed.

C.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture of the Acquirer Shares has been completed under Section VII of the Final Judgment, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VII of this Final Judgment.

## X. Compliance Inspection

A.      For purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney

21

General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

1.     access during defendants' office hours to inspect and copy, or at plaintiff's option, to require defendants to provide copies of, all books, ledgers, accounts, records and documents in the possession, custody, or control of defendants, relating to any matters contained in this Final Judgment; and

2.     to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by defendants.

B.     Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.     If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal

22

Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to

claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United

States shall give defendants ten (10) calendar days notice prior to divulging such material in any

legal proceeding (other than a grand jury proceeding).

## XI. No Reacquisition

Defendants may not reacquire any part of the Divested Business during the term of this

Final Judgment.

## XII. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this

Court at any time for further orders and directions as may be necessary or appropriate to carry out

or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to

punish violations of its provisions.

## XIII. Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the

date of its entry.

## XIV. Public Interest Determination

Entry of this Final Judgment is in the public interest. The parties have complied with the

requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making

copies available to the public of this Final Judgment, the Competitive Impact Statement, and any

comments thereon and the United States' responses to comments. Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and response to

23

comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____


Court approval subject to procedures of the Antitrust Procedures
and Penalties Act, 15 U.S.C. § 16.


_____

United States District Judge